IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-866

Filed 18 June 2024

Wake County, No. 21 DHC 23

THE NORTH CAROLINA STATE BAR, Plaintiff,

v.

MARK A. KEY, Attorney, Defendant.

Appeal by Defendant and cross-appeal by Plaintiff from order entered 20 February 2023 by the Disciplinary Hearing Commission of the North Carolina State Bar. Heard in the Court of Appeals 16 April 2024.

*The North Carolina State Bar, by Interim Counsel Carmen H. Bannon and Deputy Counsel Savannah B. Perry, for Plaintiff-Appellee/Cross-Appellant.*

*Mark A. Key, Pro se, Defendant-Appellant/Cross-Appellee.*

COLLINS, Judge.

Mark Key ("Defendant") appeals, and the North Carolina State Bar ("Plaintiff") cross-appeals, from an order of discipline entered by the Disciplinary Hearing Commission of the North Carolina State Bar ("DHC") suspending Defendant's law license for five years and allowing him to seek a stay of the balance of the suspension after three years if he complies with certain conditions. For the reasons stated herein, we affirm in part, dismiss in part, and vacate and remand in part.

## I.     Procedural Background

Plaintiff filed a complaint against Defendant on 30 September 2021. Defendant filed three separate motions to extend his time to answer the complaint, which were granted. Defendant filed an answer on 22 December 2021.

The DHC entered an order on 6 May 2022 scheduling the disciplinary hearing for 28 November through 2 December 2022. The DHC entered a consent order on 7 July 2022 setting the discovery deadline for 7 October 2022. Defendant filed a motion to stay the disciplinary proceedings pending the outcome of an ongoing federal investigation into his tax-related crimes, which was denied.

Plaintiff served its first requests for admission, first set of interrogatories, and first request for production of documents on 29 July 2022. Defendant served his responses to Plaintiff's first requests for admission on 26 August 2022 but did not timely respond to Plaintiff's first set of interrogatories or first request for production. Plaintiff served its second request for production on 2 September 2022. Defendant sent Plaintiff an email containing five PDF attachments on 12 September 2022 but did not indicate how the documents were responsive to Plaintiff's first request for production. Defendant served his responses to Plaintiff's first set of interrogatories on 14 September 2022.

Plaintiff filed a motion to compel on 16 September 2022, alleging that Defendant's responses to Plaintiff's first set of interrogatories and first request for production "are wholly inadequate and are not consistent with the rules or warranted

by existing law." Plaintiff also filed a motion to determine the sufficiency of Defendant's responses to Plaintiff's first requests for admission, alleging that "[m]ost of Defendant's responses to Plaintiff's [requests] are inadequate, inconsistent with the rules governing discovery, and not warranted by existing law." Plaintiff filed a second motion to compel on 13 October 2022, alleging that Defendant did not respond to Plaintiff's second request for production.

The DHC entered an order on 19 October 2022 granting Plaintiff's motion to compel and ordering Defendant to fully respond to Plaintiff's first set of interrogatories and first request for production within three business days. Defendant delivered his responses to Plaintiff's first set of interrogatories and first request for production via a USB drive on 21 October 2022. Three days later, Plaintiff notified Defendant that it could only access certain documents on the USB drive. Defendant sent Plaintiff an email the following day containing 39 PDF attachments but did not indicate how the documents were responsive to Plaintiff's first request for production.

The DHC entered an order on 1 November 2022 granting Plaintiff's second motion to compel and ordering Defendant to respond to Plaintiff's second request for production by 3 November 2022. The DHC also entered an order on 2 November 2022 finding that Defendant's responses to Plaintiff's first requests for admission did not comply with Rule 36 of the North Carolina Rules of Civil Procedure and ordering Defendant to correct his responses within three business days. Defendant did not

respond to Plaintiff's second request for production and did not correct his responses to Plaintiff's first requests for admission. As a result, the DHC entered an order on 7 November 2022 deeming certain requests for admission admitted.

Plaintiff filed a motion for sanctions on 8 November 2022, alleging that Defendant's responses to Plaintiff's first set of interrogatories were "evasive, incomplete, or non-responsive"; Defendant's responses to Plaintiff's first request for production did not indicate how the documents were responsive to Plaintiff's requests and Defendant failed to produce most of the requested documents; and Defendant failed to respond to Plaintiff's second request for production. Plaintiff requested that the DHC enter an order prohibiting Defendant from introducing into evidence or objecting to the admissibility of any documents that would have been responsive to its requests for production. The DHC denied the motion.

After a hearing, the DHC entered an order of discipline on 20 February 2023 suspending Defendant's law license for five years and allowing him to seek a stay of the balance of the suspension after three years if he complies with certain conditions. Defendant appealed, and Plaintiff cross appealed.

## II. Factual Background

Plaintiff alleged in its complaint that Defendant had engaged in numerous instances of misconduct, detailed below.

## A. Tax-Related Crimes

Defendant was the sole owner of The Key Law Office, which was registered as

a professional corporation. As owner of The Key Law Office, Defendant employed several employees from 2016 to 2020, including himself. During this period, Defendant committed several tax-related crimes in his capacity as owner of The Key Law Office and in his individual capacity.

Defendant failed to withhold or pay over to the Internal Revenue Service ("IRS") and the North Carolina Department of Revenue ("NCDOR") amounts due for federal and state income taxes on the wages of his employees. Furthermore, Defendant repeatedly failed to file Employer's Quarterly Federal Tax Returns ("IRS Form 941") to report the amount of Social Security and Medicare taxes ("FICA taxes") withheld from the wages of his employees. During the fourth quarter of 2019, Defendant failed to pay over to the IRS the FICA taxes withheld from the wages of his employees.

Defendant failed to timely file his federal income tax returns from 2015 to 2018. Defendant filed his 2018 federal income tax return in June 2020 and his 2015, 2016, and 2017 federal income tax returns in September 2020. At the time he filed his 2015, 2016, and 2017 federal income tax returns, Defendant failed to pay the taxes due. Defendant also failed to pay the federal income taxes due at the time he filed his 2019 and 2020 returns.

Defendant similarly failed to timely file his state income tax returns from 2015 to 2018. Defendant filed his 2018 state income tax return in June 2020 and his 2015, 2016, and 2017 state income tax returns in August 2021. At the time he filed his

state income tax returns, Defendant failed to pay the full amount of taxes due for 2015 and 2016. Defendant also failed to pay the state income taxes due at the time he filed his 2019 and 2020 returns.

## B. Employee Taxes

Defendant employed Diamond Zephir as an associate from April to August 2018. Defendant told Zephir that he would pay federal and state income taxes on her behalf but failed to do so. As a result, Zephir owed federal and state income taxes on the wages she earned while employed by Defendant. Defendant also issued a W-2 to Zephir that underreported her wages. When Zephir received the inaccurate W-2 and discovered that Defendant had failed to withhold federal and state income taxes, she contacted Defendant. Defendant assured Zephir that he would issue a corrected W-2 that accurately reflected her wages and tax withholdings but failed to do so.

Zephir asked Defendant to pay the federal and state income taxes she owed, and Defendant refused. Zephir filed suit against Defendant and obtained a judgment for the federal and state income taxes she owed, the tax refund she would have been entitled to if her taxes had been properly paid, and litigation costs. The following day, Defendant filed a Transmittal of Wage and Tax Statement ("IRS form W-3") along with W-2 forms for his 2018 employees. Defendant submitted the W-2 for Zephir that underreported her wages.

## C. Trust Accounting

Debra Jordan and her two children retained Defendant to handle a personal

injury matter in June 2016. In November 2020, Plaintiff received a report from an insurance adjuster that Defendant had received settlement checks but had not returned executed settlement releases for his clients. Plaintiff opened a grievance file to investigate the report and conducted an audit of Defendant's trust account. The audit revealed that (1) Defendant failed to ensure that the entrusted funds he received on behalf of the Jordans were deposited into his trust account; (2) when Defendant received payments that were partially legal fees and partially entrusted funds, he did not deposit those payments into his trust account intact; (3) Defendant did not prepare required monthly and quarterly reconciliation reports; (4) Defendant failed to maintain complete and accurate client ledgers; (5) Defendant commingled earned fees and entrusted funds; and (6) Defendant did not promptly pay or deliver clients' entrusted property to which they were entitled.

## D. Representation of T.M.

T.M. retained Zephir in August 2018 to handle an absolute divorce and alimony claim. After Zephir resigned from The Key Law Office, Defendant began representing T.M. Defendant also agreed to represent T.M. in her pending child custody and equitable distribution matters. As a result, the lawyer that T.M. had previously retained to handle these matters withdrew. Defendant filed a complaint for absolute divorce, alimony, and attorney's fees on 24 September 2018. The trial court entered a judgment for absolute divorce on 19 November 2018.

The child custody matter was scheduled to be heard on 2 May 2019. Prior to

the hearing, Defendant's assistant informed T.M. that Defendant would not be able to attend. Defendant sent another lawyer, who was not employed by The Key Law Office, to attend the hearing. T.M. had never met with or spoken to that lawyer, and she had not given Defendant permission to share confidential information with the lawyer.

In the weeks following the meeting, Defendant did not respond to T.M.'s emails and phone calls. Defendant eventually met with T.M. on 9 July 2019 and "provided an explanation for why he wasn't there and asked pretty much what happened," and T.M. "gave a recount of what [she] had experienced or what [she] could remember[.]"

On 27 January 2020, T.M. sent Defendant an email stating, "I would like to request the Key Law Office and any associate withdraw from representation on my cases pending, effective immediately. Please direct any needed correspondence and documentation to this e-mail." Defendant did not withdraw from representation. Three days later, Defendant filed a notice of hearing scheduling T.M.'s equitable distribution matter for mid-February.

**E. Mistrial**

Defendant represented a client charged with felonious restraint, and the matter came on for trial in Wake County Superior Court on 11 June 2019. During the State's direct examination of a witness, Defendant continuously raised the same objection that had been previously overruled. Defendant repeatedly attempted to elicit testimony from a witness on cross-examination that the trial court had

previously ruled inadmissible. Defendant became angry and raised his voice at the trial court in the presence of the jury. At that point, the trial court ended the proceedings for the day.

After the jury left the courtroom, the trial court said, "Mr. Key let me tell you something. . . [.]" Before the trial court could finish the statement, Defendant stood up, aggressively pointed his finger, and said, "Let me tell you something. . . ." The trial court instructed Defendant to sit down and informed him that it could initiate contempt proceedings against him based on his misconduct. The trial court gave Defendant the opportunity to apologize, but he did not do so. Due to Defendant's misconduct in the presence of the jury, the trial court entered an order declaring a mistrial on 17 June 2019.

**F. Mortgage Fraud**

Defendant's girlfriend purchased a home in New Hill for approximately $740,000 in October 2016, and Defendant lived in the home with her until their relationship ended in May 2020. Defendant wanted to purchase the home from her when their relationship ended, but she refused to sell it to him.

In July 2020, Defendant was introduced to Kristian Smith. Defendant expressed his desire to purchase the home, and Smith agreed to purchase the home and sell it to Defendant. Smith incorporated an entity called Sweet Fruits Healing, LLC ("Sweet Fruits") on 14 July 2020. Around this time, Defendant established a joint bank account with Smith. Defendant began depositing money into the joint

account over the next two months. Smith never deposited any funds into the joint account.

Sweet Fruits purchased the home for $740,000 on 28 September 2020. Sweet Fruits funded the purchase with a one-year mortgage loan for $518,000 and money that Defendant had deposited into the joint account. After Sweet Fruits purchased the home, Defendant began living there again.

Defendant purchased the home from Sweet Fruits for $522,000 on 30 April 2021. Defendant funded the purchase with a mortgage loan from Navy Federal Credit Union for $531,135. In his loan application, Defendant falsely represented that he did not have any credits towards the purchase of the house; the property value was $522,000; he did not have a business affiliation with the seller of the property; he was not currently delinquent or in default on a federal debt; and he had not "entered into any other agreement, written or oral, in connection with this real estate transaction."

The loan application contained a Borrower Certification and Authorization, which stated:

> In applying for the loan, I completed a loan application containing information which may include the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I certify that all of the information is true and complete. I made no misrepresentations in the loan application or other documents, nor did I omit any pertinent information.

By signing the loan application, Defendant also acknowledged that the "information [he] provided in this application is true, accurate, and complete as of the date [he] signed this application."

Defendant submitted his earning statements for January and February 2021 in support of his loan application, which falsely indicated that he received bi-weekly paychecks from his law firm and that federal and state income taxes had been withheld from his wages.

## G. Misconduct During Grievance Process

Plaintiff opened a grievance file to investigate the tax-related matters and sent Defendant a letter of notice on 15 March 2021 advising him of the grievance and directing him to submit a written response within 15 days. The following day, Defendant was served with a subpoena directing him to produce certain documents by 9 April 2021. Defendant did not submit a written response to the letter and did not produce any documents.

Plaintiff emailed Defendant on 21 April 2021 notifying him that he had failed to comply with the subpoena. Defendant responded that same day and attached "some of the information" that was requested in the subpoena. Defendant sent additional documents on 27 April 2021, and Plaintiff sent a detailed follow-up email notifying him which documents were missing. After Defendant sent additional documents on 3 May 2021, Plaintiff sent another detailed follow-up email notifying him which documents were missing. Defendant submitted his untimely response to

the letter of notice on 11 May 2021.

Plaintiff interviewed Defendant on 7 July 2021, and Defendant made multiple misrepresentations during the interview. Plaintiff also reviewed a spreadsheet with Defendant during the interview to explain which documents were still missing.

Despite multiple reminders as to which documents were missing, Defendant failed to completely produce all subpoenaed documents.

### III. Standard of Review

There are two phases in attorney disciplinary cases: (1) "an adjudicatory phase in which the DHC determines whether the defendant committed the misconduct"; and (2) "a disposition phase in which the DHC determines the appropriate discipline." *N.C. State Bar v. Adams*, 239 N.C. App. 489, 493, 769 S.E.2d 406, 410 (2015) (citation omitted).

In reviewing an order of discipline, we apply the whole record test to determine whether the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law. *N.C. State Bar v. Talford*, 356 N.C. 626, 632, 576 S.E.2d 305, 309 (2003). "The evidence is substantial if, when considered as a whole, it is such that a reasonable person might accept as adequate to support a conclusion." *N.C. State Bar v. Key*, 189 N.C. App. 80, 84, 658 S.E.2d 493, 497 (2008) (citation omitted). The whole record test "also mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn." *Talford*, 356

N.C. at 632, 576 S.E.2d at 310 (citation omitted). "However, the mere presence of contradictory evidence does not eviscerate challenged findings, and the reviewing court may not substitute its judgment for that of the committee." *Key*, 189 N.C. App. at 84, 658 S.E.2d at 497 (citations omitted). Unchallenged findings of fact are binding on appeal. *Id.* at 87, 658 S.E.2d at 498.

The whole record test must be applied separately to the adjudicatory phase and the disposition phase. *N.C. State Bar v. Megaro*, 286 N.C. App. 364, 372, 880 S.E.2d 401, 407 (2022).

To satisfy the evidentiary requirements of the whole record test, "the evidence used by the DHC to support its findings and conclusions must rise to the standard of clear, cogent, and convincing." *Talford*, 356 N.C. at 632, 576 S.E.2d at 310 (quotation marks, brackets, and citation omitted). Clear, cogent, and convincing "describes an evidentiary standard stricter than a preponderance of the evidence, but less stringent than proof beyond a reasonable doubt." *N.C. State Bar v. Sheffield*, 73 N.C. App. 349, 354, 326 S.E.2d 320, 323 (1985) (citation omitted). "It has been defined as evidence which should fully convince." *Id.* (quotation marks and citation omitted).

## IV. Defendant's Appeal

Defendant essentially argues that the DHC erred by finding and concluding that he engaged in any sort of misconduct. We address his arguments in the same order in which the DHC organized its findings and conclusions in its order of

discipline.[1]

## A. Tax-Related Crimes

Defendant argues that the DHC erred by finding that he committed multiple tax-related crimes.

Defendant challenges the following findings of fact:

> 18. [Defendant] failed to pay over to the IRS the FICA taxes collected from the wages of firm employees during the fourth quarter of 2019.
>
> . . . .
>
> 21. At the time he belatedly filed the 2015-2018 returns, [Defendant] did not pay the federal income taxes due for tax years 2015 through 2017.
>
> 22. [Defendant] also did not pay the federal income taxes that were due in connection with his 2019 and 2020 returns.
>
> . . . .
>
> 25. At the time he belatedly filed the returns for tax years 2015 through 2017, [Defendant] did not pay in full the state income taxes, plus penalties and interest, due in connection with his 2015 and 2016 returns.
>
> 26. [Defendant] also did not pay the state income taxes that were due in connection with his 2019 and 2020 returns.
>
> . . . .
>
> 28. Under this Panel's clear, cogent and convincing standard of review, [Defendant] violated 26 U.S.C. § 7203 by:
>
> > (a) willfully failing to timely file federal income tax

---

[1] We do not address the numerous new arguments Defendant presented in his reply brief as "Defendant may not use his reply brief to make new arguments on appeal." *State v. Triplett*, 258 N.C. App. 144, 147, 810 S.E.2d 404, 407 (2018). Likewise, we do not consider the numerous arguments that Defendant presented in his Appellee brief but did not assert in his Appellant brief "due to page limitations[.]"

returns for tax years 2015 through 2018; and

(b) willfully failing to timely pay federal income taxes owed for 2015 through 2017, 2019, and 2020.

. . . .

30. Under this Panel's clear, cogent and convincing standard of review, [Defendant] violated 26 U.S.C. § 7202 by:

(a) willfully failing to withhold federal income taxes from the wages of his law firm employees, including his own; and

(b) willfully failing to pay over to Treasury all FICA taxes withheld from the wages of firm employees in 2019.

. . . .

33. Under this Panel's clear, cogent and convincing standard of review, [Defendant] violated N.C. Gen. Stat. §§ 105-236(a)(8) and (9) by:

(a) willfully failing to withhold or pay over to NCDOR amounts due for state income taxes on the wages of any law firm employees, including his own, during the period from 2016 through 2020;

(b) willfully failing to timely file state personal income tax returns for tax years 2015 through 2018; and

(c) willfully failing to timely pay state income taxes for tax years 2015 through 2017, 2019, and 2020.

## 1. *Findings of Fact 18, 21, 22, 25, and 26*

Defendant's Form 941 for the fourth quarter of 2019 was due by 31 January 2020. Defendant did not file his Form 941 for the fourth quarter of 2019 until 9 March 2020. The IRS transcript reflects that Defendant made a partial payment when he untimely filed the Form 941, but still owed $8,274.83 as of 22 February 2021. Finding

of Fact 18 is therefore supported by substantial evidence.

Defendant filed his 2015, 2016, and 2017 federal income tax returns in September 2020. The IRS transcripts reflect that: (1) Defendant did not make any payments towards his 2015 taxes, and he owed $2,899 as of 3 October 2022; (2) Defendant did not make any payments towards his 2016 taxes until 4 June 2021, approximately nine months after he filed the return; and (3) Defendant did not make any payments towards his 2017 taxes until 4 August 2021, and he owed $6,299.14 as of 3 October 2022. Accordingly, Finding of Fact 21 is supported by substantial evidence.

Defendant's 2019 federal income tax return shows that Defendant owed $7,540 in taxes. Although the tax return was signed by Defendant and dated 5 July 2020, the IRS transcript reflects that Defendant did not file a tax return for 2019.[2] The IRS transcript reflects that Defendant made the following payments totaling $6,950: (1) $2,900 on 10 April 2020; (2) $3,500 on 27 August 2021; and (3) $550 on 27 December 2021. As Defendant's 2019 federal income tax return shows that he owed $7,540 in taxes and Defendant only paid $6,950, Defendant failed to pay the full amount of taxes due for 2019. Defendant admitted in his answer that he "did not pay in full the federal income taxes that were due in connection with his 2020 return." Accordingly, Finding of Fact 22 is supported by substantial evidence.

---

[2] Defendant filed an "[a]mended tax return" on 19 August 2021, which was "sent back to originator" on 15 July 2022.

Defendant's state income tax records from NCDOR reflect that he owed the following amounts towards his taxes as of 26 August 2021: (1) $29.38 for 2015; (2) $500.91 for 2016; (3) $1,325.59 for 2019; and (4) $11,450.52 for 2020. Accordingly, Findings of Fact 25 and 26 are supported by substantial evidence.

### 2. *Finding of Fact 28*

Finding of Fact 28 is more appropriately categorized as a conclusion of law, and we therefore review it de novo. *See Key*, 189 N.C. App. at 88, 658 S.E.2d at 499.

Under 26 U.S.C. § 7203,

> Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor[.]

26 U.S.C. § 7203. Willfulness is the "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991).

The record is replete with evidence that Defendant's failure to timely file and pay his federal income tax returns was willful. Defendant has an extensive history of failing to timely file his income taxes beginning in 1998. The IRS sent Defendant multiple notices of federal tax liens between 2001 and 2016 due to his failure to pay

taxes.[3] Defendant testified at the disciplinary hearing that the IRS had levied his bank accounts in the past to collect delinquent federal income taxes. When Defendant sold his home in 2015, he was required to pay $31,152.46 to discharge his home from federal tax liens. The IRS also auctioned off property owned by Defendant to collect delinquent taxes on 11 January 2018.

Defendant stated during his interview with Plaintiff, "I don't want to pay taxes." Defendant also admitted in the following exchange that he intentionally refrained from paying his 2009 tax delinquencies until the ten-year statute of limitations had expired:

> [PLAINTIFF]: But with that said you're just waiting for the statute of limitations to pass.
>
> [DEFENDANT]: And that's true. That's a true statement.
>
> [PLAINTIFF]: I mean, what do you think with most attorneys having a tax lien filed on them, most attorneys would just—
>
> [DEFENDANT]: And most attorneys wait for a statute of limitations [chuckles].
>
> [PLAINTIFF]: Not as it relates to taxes, Mr. Key. Not as it relates to taxes.
>
> [DEFENDANT]: Even when it relates to taxes. If you're an attorney, you have an attorney's mind for the most part and when I saw a statute of limitations back in February

---

[3] Defendant argues that the DHC abused its discretion by admitting past tax liens into evidence. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith[,]" but may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2023). As the tax liens were admitted into evidence to show that Defendant knew he had an obligation to pay taxes and intentionally ignored that obligation, the DHC did not abuse its discretion by admitting them into evidence.

> or so I was like, "OK great now I can apply for a mortgage."
>
> [PLAINTIFF]: Do you believe that your attorney mindset to wait for the statute of limitations is the right one to have such that you're disregarding your legal obligation to timely pay your taxes?
>
> [DEFENDANT]: So I think that's a respectable question. I don't. I think to a -- that depends on the circumstances but you said with respect to the failure to pay taxes, I have an issue with a personal issue with this - the interest. I have a personal issue with the—And so what I was talking to the lady about was the interest and the penalties and the amount associated with that. I don't like that.

Defendant's extensive history of failing to timely file and pay his income taxes, coupled with his statements to Plaintiff, constitutes substantial evidence to support a finding that Defendant willfully failed to timely file and pay his federal income taxes. Accordingly, Finding of Fact 28 is supported by substantial evidence.

### 3. *Finding of Fact 30*

Finding of Fact 30 is more appropriately categorized as a conclusion of law, and we therefore review it de novo. *See Key*, 189 N.C. App. at 88, 658 S.E.2d at 499.

Under 26 U.S.C. § 7202, any person required "to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony[.]" 26 U.S.C. § 7202. A person "includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." *Id.* § 7343.

Defendant argues that Plaintiff was required to "present evidence of the portion of employee wages that constitutes federal taxable wages for employees of [The Key Law Office] from 2016-2020" but cites no authority to support this proposition aside from merely referencing 26 U.S.C. § 3402, which provides that an "employer making payment of wages shall deduct and withhold upon such wages a tax determined in accordance with tables or computational procedures prescribed by the Secretary." *Id.* § 3402(a)(1). Defendant also argues that it "is not a violation of 7202 if the defendant fails to withhold federal income taxes from his own wages" but cites no authority to support this proposition. These arguments are thus deemed abandoned. *See* N.C. R. App. P. 28(b)(6). As Defendant makes no supported arguments regarding his willful failure to withhold federal income taxes from the wages of his employees, Finding of Fact 30(a) is binding on appeal.

Defendant argues that he "did not receive adequate notice as required by law that [Plaintiff] intended to argue that [he] willfully failed to timely file [The Key Law Office's] quarterly tax returns[,]" and that Plaintiff "failed to present sufficient evidence that [he] willfully failed to file [The Key Law Office's] business tax returns." Contrary to Defendant's assertions, Plaintiff did not make this argument and the DHC made no such finding. Rather, the DHC found that Defendant violated 26 U.S.C. § 7202 by "willfully failing to *pay over* to Treasury all FICA taxes withheld from the wages of firm employees in 2019." (emphasis added). As Defendant does

not specifically challenge this finding of fact, it is binding on appeal.[4]  *Key*, 189 N.C.

App. at 87, 658 S.E.2d at 498.

a.  *Finding of Fact 33*

Finding of Fact 33 is more appropriately categorized as a conclusion of law,

and we therefore review it de novo.  *See id.* at 88, 658 S.E.2d at 499.

Under N.C. Gen. Stat. § 105-236(a)(8), any person "required to collect,

withhold, account for, and pay over any tax who willfully fails to collect or truthfully

account for and pay over the tax shall . . . be guilty of a Class 1 misdemeanor."  N.C.

Gen. Stat. § 105-236(a)(8) (2023).  Furthermore, under section 105-236(a)(9),

> [a]ny person required to pay any tax, to file a return, to
> keep any records, or to supply any information, who
> willfully fails to pay the tax, file the return, keep the
> records, or supply the information, at the time or times
> required by law, or rules issued pursuant thereto, is . . .
> guilty of a Class 1 misdemeanor.

*Id.* § 105-236(a)(9) (2023).  "Willfully means to purposely commit an offense in

violation of a known legal duty."  *State v. Howell*, 191 N.C. App. 349, 354, 662 S.E.2d

922, 926 (2008) (citations omitted).

Defendant argues that Plaintiff was required to "present evidence of the

portion of employee wages, if any, that constitutes state taxable wages for employees

---

[4] Defendant summarily argues that his law firm's failure "to pay the fourth quarter employer portion of FICA taxes does not subject [him] to criminal liability under 7202."  However, as owner of The Key Law Office, Defendant was required to "collect, account for, and pay over any tax imposed[,]" including FICA taxes.  26 U.S.C. § 7202.

of [The Key Law Office] from 2016-2020." Defendant cites no authority to support this proposition aside from merely referencing N.C. Gen. Stat. § 105-163.2, which provides that an employer "shall deduct and withhold from the wages of each employee the State income taxes payable by the employee on the wages." N.C. Gen. Stat. § 105-163.2(a) (2023). This argument is thus deemed abandoned. *See* N.C. R. App. P. 28(b)(6). As Defendant makes no supported arguments regarding his willful failure to withhold state income taxes from the wages of his employees, Finding of Fact 33(a) is binding on appeal.

As further discussed above, Defendant's extensive history of failing to timely file and pay his income taxes, coupled with his statements to Plaintiff, constitutes substantial evidence to support a finding that Defendant willfully failed to timely file and pay his state income taxes. Finding of Fact 33(b) is therefore supported by substantial evidence.

For the reasons stated above, the DHC did not err by finding and concluding that Defendant committed multiple tax-related crimes in his capacity as owner of The Key Law Office and in his individual capacity.

**B. Employee Taxes**

Defendant argues that the DHC erred by concluding that he violated North Carolina Rule of Professional Conduct 8.4(c) by "falsely telling Zephir that he would be responsible for paying income taxes on her behalf" and "knowingly certifying on the IRS form W-3 for tax year 2018 that Zephir's inaccurate W-2 was accurate[.]"

It is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness as a lawyer[.]" N.C. R. Prof. Cond. 8.4(c).[5]

Defendant challenges the following findings of fact:

> 39. . . . Zephir owed federal and state income taxes on the income earned while she was employed by [Defendant's] law firm.
>
> . . . .
>
> 41. When Zephir received the inaccurate W-2 and discovered the income tax debt caused by [Defendant's] failure to withhold from her paychecks, she contacted [Defendant].
>
> . . . .
>
> 45. On 9 May 2019, approximately three months after Zephir notified [Defendant] that her W-2 was inaccurate and one day after he participated in the hearing at which judgment was entered against him on Zephir's claim, [Defendant] filed with the IRS a Transmittal of Wage and Tax Statements (IRS form W-3) along with W-2 forms for the employees of his law firm during 2018.
>
> 46. The W-2 form for Zephir that [Defendant] filed on 9 May 2019 underreported Zephir's 2018 wages.

Zephir's verified complaint against Defendant stated that she "owe[d] $317.00 to the State of North Carolina and $792.00 to the Federal Government, totaling $1,109.00 as a result of Defendants not having paid [her] North Carolina State and Federal taxes throughout her employment with the Key Law Office."

---

[5] Defendant argues that Rule 8.4(c) does not apply to "contractual disputes between attorneys where it does not involve a crime and/or a client." Defendant cites no authority to support this proposition, and we find no merit to this contention.

Zephir also testified during her deposition that she owed taxes on the income she earned while employed by Defendant. Accordingly, Finding of Fact 39 is supported by substantial evidence.

Finding of Fact 41 is supported by screenshots of multiple Facebook messages that Zephir sent Defendant regarding her inaccurate W-2 as well as a letter that Zephir sent Defendant on 11 February 2019 detailing the inaccuracies in her W-2.

Defendant argues that Finding of Fact 45 is erroneous because "the W-2 was not filed with the IRS as [Plaintiff] contends and the DHC found" as the "law does not require an employer to file W-2's with the IRS." Defendant misconstrues the DHC's finding. The DHC found that Defendant filed "a Transmittal of Wage and Tax Statement (IRS form W-3) *along with W-2 forms* for the employees of his law firm during 2018." (emphasis added). This comports with the instructions on IRS Form W-3, which state, "Mail Form W-3 with Copy A of Form(s) W-2[.]" However, the portion of Finding of Fact 45 stating that Defendant filed this form "with the IRS" is unsupported because a W-3 is filed with the Social Security Administration, not the IRS. However, this error is inconsequential, and the remainder of Finding of Fact 45 is supported by substantial evidence.

Finding of Fact 46 is supported by the copy of Zephir's inaccurate W-2 that was submitted with the W-3 filed by Defendant.

In addition to the findings of fact above, the DHC also made the following unchallenged findings of fact:

37. [Defendant] told Zephir that he would be responsible for paying to the IRS and NCDOR federal and state income taxes due in connection with her employment at the law firm.

38. [Defendant] did not withhold or pay over to the tax authorities any federal or state income taxes on behalf of Zephir during her employment.

. . . .

40. The W-2 [Defendant] issued to Zephir by [Defendant's] law firm in early 2019 falsely underreported her wages by approximately $3,000.00.

. . . .

42. [Defendant] assured Zephir that he would change her W-2 to accurately reflect the income she received as well as all tax withholdings.  He failed to do so.

43. Zephir asked [Defendant] to pay the amounts she owed to the tax authorities due to [Defendant's] failure to withhold from her paychecks.  [Defendant] refused.

. . . .

47. By signing the W-3, [Defendant] swore under penalty of perjury to the accuracy of the W-2 that he knew underreported Zephir's wages.

The DHC's findings of fact support its conclusions of law that:

(b) By falsely telling Zephir that he would be responsible for paying income taxes on her behalf Defendant engaged in conduct involving dishonesty, deceit or misrepresentation in violation of Rule 8.4(c);

(c) By knowingly certifying on the IRS form W-3 for tax year 2018 that Zephir's inaccurate W-2 was accurate, Defendant engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c)[.]

Accordingly, the DHC did not err by concluding that Defendant violated Rule 8.4(c).

## C. Trust Accounting

Defendant argues that the DHC erred by concluding that he failed to comply with the Rules of Professional Conduct regarding his trust account.

### 1. *Rule 1.15-2(a), (b), and (g)*

Defendant argues that the DHC erred by concluding that he violated Rule 1.15-2(a), (b), and (g) by "failing to ensure that entrusted funds he received on behalf of [the Jordans] were deposited into his trust account" and "failing to deposit payments that were partially for his fees and partially entrusted funds into his trust account intact[.]"

Rule 1.15-2 provides:

> (a) Entrusted Property. All entrusted property shall be identified, held, and maintained separate from the property of the lawyer, and shall be deposited, disbursed, and distributed only in accordance with this Rule 1.15.
>
> (b) Deposit of Trust Funds. All trust funds received by or placed under the control of a lawyer shall be promptly deposited in either a general trust account or a dedicated trust account of the lawyer. . . .
>
> . . . .
>
> (g) Mixed Funds Deposited Intact. When funds belonging to the lawyer are received in combination with funds belonging to the client or other persons, all of the funds shall be deposited intact.

N.C. R. Prof. Cond. 1.15-2(a), (b), (g).[6]

---

[6] The Rules of Professional Conduct have been amended such that Rule 1.15-2(g) is now Rule 1.15-2(h). We use the version of the Rules of Professional Conduct in effect at the time the order of discipline was entered.

The DHC made the following unchallenged findings of fact, which are binding on appeal:

> 48. In or around June 2016, Debra Jordan and her children, [Jeffrey and Jaccob[7]] (collectively "the Jordans") retained [Defendant] to represent them in a personal injury matter.
>
> 49. In November 2020, the insurance adjuster assigned to the Jordans' matters reported to the State Bar that [Defendant] accepted settlement offers on behalf of the Jordans in June 2019 and that [Defendant] received settlement checks but had not returned executed settlement agreements for Debra or [Jeffrey].
>
> 50. The State Bar opened grievance file no. 20G0861 to investigate the report from the insurance adjuster assigned to the Jordans' matters.
>
> 51. In the investigation of grievance file no. 20G0861, the State Bar conducted an audit of [Defendant's] general trust account at Truist (formerly BB&T Bank) . . . .
>
> 52. The State Bar's investigation and audit revealed the following deficiencies in [Defendant's] trust account management and handling of entrusted funds:
>
>> (a) [Defendant] failed to ensure that the entrusted funds he received on behalf of Debra and [Jeffrey] Jordan were deposited into his trust account;
>>
>> (b) When [Defendant] received payments that were partially for his fees and partially entrusted funds, [Defendant] did not deposit those payments into his trust account intact. This failure to deposit mixed funds intact occurred, for example, when [Defendant] received payments from clients for criminal and civil cases that included court costs and/or filing fees[.]

These findings of fact support the DHC's conclusion of law that:

---

[7] We use a pseudonym to protect the identities of the children.

> (d) By failing to ensure that entrusted funds he received on behalf of Debra and [Jeffrey] Jordan were deposited into his trust account and by failing to deposit payments that were partially for his fees and partially entrusted funds into his trust account intact, Defendant failed to properly maintain and disburse entrusted funds in violation of Rule 1.15-2(a), (b), and (g)[.]

Accordingly, the DHC did not err by concluding that Defendant violated Rule 1.15-2(a), (b), and (g).

### 2. *Rule 1.15-3(d)(1) and (2)*

Defendant concedes that he failed to prepare required monthly and quarterly reconciliation reports for his trust accounts as required by Rule 1.15-3(d)(1) and (2), but nonetheless argues that the DHC erred by concluding that he violated Rule 1.15-3(d)(1) and (2) because his failure "was not grossly negligent, intentional, or willful." However, Rule 1.15-3(d)(1) and (2) contains no such scienter requirement. *See* N.C. R. Prof. Cond. 1.15-3(d)(1) ("Each month, the balance of the trust account as shown on the lawyer's records shall be reconciled with the current bank statement balance for the trust account."); N.C. R. Prof. Cond. 1.15-3(d)(2) ("For each general trust account, a reconciliation report shall be prepared at least quarterly."). Accordingly, the DHC did not err by concluding that Defendant violated Rule 1.15-3(d)(1) and (2) by failing to prepare required monthly and quarterly reconciliation reports for his trust accounts.

### 3. *Rule 1.15-2(a) and (k)*

Defendant argues that the DHC erred by concluding that he violated Rule

1.15-2(a) and (k) by "disbursing more funds from his trust account for clients than he held in trust for those clients[.]"

Rule 1.15-2 provides:

> (a) Entrusted Property. All entrusted property shall be identified, held, and maintained separate from the property of the lawyer, and shall be deposited, disbursed, and distributed only in accordance with this Rule 1.15.
>
> . . . .
>
> (k) No Benefit to Lawyer or Third Party. A lawyer shall not use or pledge any entrusted property to obtain credit or other personal benefit for the lawyer or any person other than the legal or beneficial owner of that property.

N.C. R. Prof. Cond. 1.15-2(a), (k).[8]

Defendant challenges Finding of Fact 52(d), which states that he "failed to maintain complete and accurate client ledgers[.]"

Plaintiff conducted an audit of Defendant's trust account in January 2021, which revealed the following: Defendant issued a check to Debra Jordan on behalf of Jeffrey for $917. The check was negotiated on 30 November 2016 and again on 16 August 2019, resulting in a negative balance of $917. Defendant did not correct the negative balance until 1 October 2020. Similarly, Defendant issued a check to Jaccob Jordan for $353.20. The check was negotiated on 13 October 2016 and again on 19 November 2019, resulting in a negative balance of $353.20. Defendant did not correct

---

[8] The Rules of Professional Conduct have been amended such that Rule 1.15-2(k) is now Rule 1.15-2(l). We use the version of the Rules of Professional Conduct in effect at the time the order of discipline was entered.

the negative balance until 1 October 2020. Defendant issued a check to another client and told her not to cash it until the following week because there were insufficient funds in her client balance to cover the full amount of the check. The client immediately deposited the check, which resulted in a negative balance of $5,100.

The client ledgers produced by Defendant never showed that Jeffrey or Jaccob Jordan had a negative balance. Defendant also produced multiple client ledgers for certain clients that differed from one version to the next. During his deposition, Defendant testified as follows:

> [PLAINTIFF:] . . . . Can you tell me, [Defendant], are these client ledgers that you produced to the State Bar?
>
> [DEFENDANT:] They are.
>
> [PLAINTIFF:] Is there a reason that you declined to authenticate them in connection with Plaintiff's Request for Admission?
>
> [DEFENDANT:] Because -- I don't know. So in 2017 we started manually putting this into the electronic system, and I have not gone into the electronic system to make sure every entry was accurate.
>
> And so honestly, when you guys asked me to produce this, I produced it as it was, and I didn't put it in the system. I had staff put it into the system. And it's not uncommon for people to miss things. It's not uncommon for people to invert numbers. It's not uncommon for them to put it under the wrong client's ledger.
>
> And so I did not want to say that these are accurate because there might be mistakes into the system since it was manually input into the system.
>
> [PLAINTIFF:] You understand that the accuracy of your trust account records is your responsibility.
>
> [DEFENDANT:] It is. . . .

Finding of Fact 52(b) is therefore supported by substantial evidence.

The DHC's findings of fact support its conclusion of law that:

> (h) By disbursing more funds from his trust account for clients than he held in trust for those clients, Defendant failed to properly maintain and disburse entrusted funds and used entrusted funds for the benefit of someone other than the beneficial owner in violation of Rule 1.15-2(a) and (k)[.]

Accordingly, the DHC did not err by concluding that Defendant violated Rule 1.15-2(a) and (k).

## 4. *Rule 1.15-2(a) and (n)*

Defendant argues that the DHC erred by concluding that Defendant violated Rule 1.15-2(a) and (n) by "not promptly paying or delivering to clients, or to third persons as directed by clients, entrusted property belonging to the clients and to which the clients are currently entitled[.]"

Rule 1.15-2 provides:

> (a) Entrusted Property. All entrusted property shall be identified, held, and maintained separate from the property of the lawyer, and shall be deposited, disbursed, and distributed only in accordance with this Rule 1.15.
>
> . . . .
>
> (n) Delivery of Client Property. A lawyer shall promptly pay or deliver to the client, or to third persons as directed by the client, any entrusted property belonging to the client and to which the client is currently entitled.

N.C. R. Prof. Cond. 1.15-2(a), (n).

Defendant challenges the italicized portion of Finding of Fact 52(f), which

states that he "*did not promptly pay or deliver to clients, or to third persons as directed by clients, entrusted property belonging to clients* and to which the clients were currently entitled." As Defendant does not challenge the remaining portion of Finding of Fact 52(f), it is binding on appeal.

When Plaintiff audited Defendant's trust account in January 2021, there were multiple clients with aged balances, including: a $4,013 balance since 16 June 2016; a $3,312.58 balance since 21 October 2016; an $11,250 balance since 17 January 2017; a $500 balance since 13 November 2017; and a $15,800 balance since 27 December 2019. Finding of Fact 52(f) is therefore supported by substantial evidence.

The DHC's findings of fact support its conclusion of law that:

> (i) By not promptly paying or delivering to clients, or to third persons as directed by clients, entrusted property belonging to the clients and to which the clients are currently entitled, Defendant failed to properly maintain and disburse entrusted funds in violation of Rule 1.15-2(a) and (n)[.]

Accordingly, the DHC did not err by concluding that Defendant violated Rule 1.15-2(a) and (n).

## D. Representation of T.M.

Defendant next argues that the DHC erred by concluding that he violated the Rules of Professional Conduct regarding his representation of T.M.

### 1. *Rule 1.6(a)*

Defendant argues that the DHC erred by concluding that he violated Rule

1.6(a) by "providing confidential information to the lawyer he sent to represent T.M. at the May 2019 hearing, who was not a member of Defendant's law firm[.]"

"A lawyer shall not reveal information acquired during the professional relationship with a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)." N.C. R. Prof. Cond. 1.6(a). "A lawyer may reveal information protected from disclosure by paragraph (a) to the extent the lawyer reasonably believes necessary:"

> (1) to comply with the Rules of Professional Conduct, the law or court order;
>
> (2) to prevent the commission of a crime by the client;
>
> (3) to prevent reasonably certain death or bodily harm;
>
> (4) to prevent, mitigate, or rectify the consequences of a client's criminal or fraudulent act in the commission of which the lawyer's services were used;
>
> (5) to secure legal advice about the lawyer's compliance with these Rules;
>
> (6) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client; to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved; or to respond to allegations in any proceeding concerning the lawyer's representation of the client;
>
> (7) to comply with the rules of a lawyers' or judges' assistance program approved by the North Carolina State Bar or the North Carolina Supreme Court; or
>
> (8) to detect and resolve conflicts of interest arising from the lawyer's change of employment or from changes in the composition or ownership of a firm, but only if the revealed information would not compromise the attorney-client

privilege or otherwise prejudice the client.

N.C. R. Prof. Cond. 1.6(b).

"Except to the extent that the client's instructions or special circumstances limit that authority, a lawyer is impliedly authorized to make disclosures about a client when appropriate in carrying out the representation." N.C. R. Prof. Cond. 1.6, cmt. 5. "Lawyers in a firm may, in the course of the firm's practice, disclose to each other information relating to a client of the firm, unless the client has instructed that particular information be confined to specified lawyers." *Id.* Although Rule 1.6 provides that disclosing confidential information between lawyers in the same firm is impliedly authorized to carry out the representation, it does not provide that disclosing confidential information to lawyers outside of the firm is impliedly authorized to carry out the representation.

Here, the DHC made the following unchallenged findings of fact, which are binding on appeal:

> 57. Just before a May 2019 custody hearing in T.M.'s case, [Defendant's] assistant informed T.M. that [Defendant] would not be able to attend the hearing.
>
> 58. [Defendant] sent another lawyer in his place who was unfamiliar with the facts and unknown to T.M.
>
> 59. [Defendant] provided information acquired during the course of his professional relationship with T.M. ("confidential information") to the lawyer he sent to fill in at the May 2019 custody hearing.
>
> 60. T.M. did not consent in writing to [Defendant] disclosing confidential information to the other lawyer, who was not a member of [Defendant's] law firm.

> 61. [Defendant's] disclosure of confidential information to a lawyer unknown to T.M. was not impliedly authorized in order to carry out the representation.

These findings of fact support the DHC's conclusion of law that, "[b]y providing confidential information to the lawyer he sent to represent T.M. at the May 2019 hearing, who was not a member of Defendant's law firm, Defendant revealed information acquired during the professional relationship in violation of Rule 1.6(a)[.]" Accordingly, the DHC did not err by concluding that Defendant violated Rule 1.6(a).

### 2. *Rule 1.4*

Defendant argues that the DHC erred by concluding that he violated Rule 1.4 by "failing to respond to T.M.'s inquiries and failing to notify T.M. of important developments in the case[.]"

Under Rule 1.4(a), a lawyer shall "promptly comply with reasonable requests for information[.]" N.C. R. Prof. Cond. 1.4(a)(4). Furthermore, a lawyer "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." N.C. R. Prof. Cond. 1.4(b).

Here, the DHC made the following unchallenged findings of fact, which are binding on appeal:

> 62. During the weeks after the May 2019 hearing, [Defendant] did not inform T.M. whether the custody order had been entered and [Defendant] did not respond to T.M.'s calls or emails.
>
> 63. Throughout the representation, [Defendant] failed to

communicate with T.M. about the status of the matter and did not respond to reasonable requests for information from T.M.

These findings of fact support the DHC's conclusion of law that:

(k) By failing to respond to T.M.'s inquiries and failing to notify T.M. of important developments in the case, Defendant failed to respond to reasonable requests for information in violation of Rule 1.4(a) and failed to provide sufficient information to allow the client to make informed decisions about the representation in violation of Rule 1.4(b)[.]

Accordingly, the DHC did not err by concluding that Defendant violated Rule 1.4.

### 3. *Rule 1.16(a), (d)*

Defendant argues that the DHC erred by concluding that he violated Rule 1.16(a) and (d) by "setting T.M.'s [equitable distribution] matter for hearing after T.M. terminated the attorney-client relationship and failing to comply with T.M.'s directive to withdraw from her case[.]"

"A client has a right to discharge a lawyer at any time, with or without cause[.]" N.C. R. Prof. Cond. 1.16, cmt. 4.[9] A lawyer "shall withdraw from the representation of a client if . . . the lawyer is discharged." N.C. R. Prof. Cond. 1.16(a)(3). "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests[.]" N.C. R. Prof. Cond. 1.16(d).

Here, the DHC made the following unchallenged findings of fact, which are

---

[9] Defendant asserts without legal support that "[j]udges do not allow attorneys to withdraw until all orders have been entered in that case." We find no legal support for this contention.

binding on appeal:

> 64. On 27 January 2020, T.M. sent [Defendant] an email terminating the representation and directing him to withdraw.
>
> 65. Three days later, [Defendant] filed a Notice of Hearing setting T.M.'s [equitable distribution] matter for mid-February. [Defendant] did not file a motion to withdraw from T.M.'s case.

The DHC's unchallenged findings of fact support its conclusion of law that:

> (l) By setting T.M.'s [equitable distribution] matter for hearing after T.M. terminated the attorney-client relationship and failing to comply with T.M.'s directive to withdraw from her case, Defendant failed to withdraw when terminated in violation of Rule 1.16(a), and failed to take reasonably practicable steps to protect a client's interests upon termination of the representation in violation of Rule 1.16(d)[.]

Accordingly, the DHC did not err by concluding that Defendant violated Rule 1.16(a) and (d).

## E. Mistrial

### 1. *Testimony of Presiding Judge*

Defendant first argues that the DHC abused its discretion by prohibiting him from cross-examining the judge who presided over the felonious restraint trial "on any personal animus that he harbors against [him]."

First, the DHC did not prohibit Defendant from cross-examining the judge about any personal animus. On direct examination, the judge testified that he had no animus towards Defendant. On cross-examination, the following exchange took place:

[DEFENDANT:] You and I have had some issues before you even became a judge, didn't we?

[WITNESS:] No. I don't know you other than I know who you are as an attorney. I never hung out with you.

[DEFENDANT:] Okay, well, let me ask you this question.

[WITNESS:] I've never had dinner with you, lunch with you. I don't know you as to be a friend of yours.

[DEFENDANT:] Okay. Well, do you recall when a restraining order was taken out against you by a female?

[PLAINTIFF:] Objection.

[DEFENDANT:] Do you recall that restraining order?

[PANEL CHAIR:] Sustained. I would like to remind you, [the judge] is not on trial here.

The DHC allowed Defendant to ask the judge whether they "had some issues" between them, and the judge answered, "No." The DHC prohibited Defendant from asking an apparently irrelevant and inflammatory question. *See State v. Mason*, 315 N.C. 724, 730, 340 S.E.2d 430, 434 (1986) ("Trial judges retain broad discretion to preclude cross-examination . . . that is intended to merely harass, annoy or humiliate a witness." (citations omitted)).

Furthermore, Defendant made no offer of proof as to what the judge's testimony would have been, and we cannot engage in speculation as to what the judge would have testified. *See State v. Raines*, 362 N.C. 1, 20, 653 S.E.2d 126, 138 (2007) ("[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious

from the record."); *see also State v. Jacobs*, 363 N.C. 815, 818, 689 S.E.2d 859, 861-62 (2010) ("Absent an adequate offer of proof, we can only speculate as to what a witness's testimony might have been." (citations omitted)). Defendant's argument is thus dismissed.

## 2. *Hearsay Evidence*

Defendant next argues that the DHC "abused its discretion by allowing hearsay into evidence over [his] objection."

In disciplinary proceedings, the North Carolina Rules of Evidence govern the admissibility of evidence. *N.C. State Bar v. Mulligan*, 101 N.C. App. 524, 527, 400 S.E.2d 123, 125 (1991). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2023). "However, out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Call*, 349 N.C. 382, 409, 508 S.E.2d 496, 513 (1998).

Here, the prosecutor in the felonious restraint trial testified as follows during the disciplinary hearing:

> [PROSECUTOR:] . . . . So during this portion, we still have -- the jury is still in the courtroom. This is -- we have gone back on to the cross-examination of the State's witness by [Defendant]. As the jury sat there, [Defendant] -- I could sense him becoming more frustrated with the court sustaining the objections that I was making to the questions that had been asked.

> And as [Defendant] began to become more frustrated, the louder he became in front of the jury. Where it ultimately culminated with him saying back to [the presiding judge] around this point he -- once a series of objections was sustained and reading back from this, [Defendant] stated, "Judge," very loudly in front of the jury.

> And that continued with the rest of the questions that he went through. He continued to essentially engage [the presiding judge] in front of the jury, became more loud, and it was to the point that one of the jurors later asked whether he was going to be going to jail.

This statement is not considered hearsay as it was not offered for the truth of the matter asserted, but rather was offered to show the effect that Defendant's misconduct had on the jury. Accordingly, the DHC did not err by admitting the prosecutor's testimony that "one of the jurors later asked whether [Defendant] was going to be going to jail."

### 3. *Testimony of Former Client*

Defendant argues that the DHC abused its discretion by prohibiting Defendant's former client from testifying during the disciplinary hearing. Defendant made no offer of proof as to what his former client's testimony would have been, and we cannot engage in speculation as to what his former client would have testified. *See Raines*, 362 N.C. at 20, 653 S.E.2d at 138; *see also Jacobs*, 363 N.C. at 818, 689 S.E.2d at 861-62. Defendant's argument is thus dismissed.

## F. Mortgage Fraud

Defendant argues that the DHC erred by concluding that he committed mortgage fraud.

Defendant challenges the following findings of fact:

> 92. In the 22 March 2021 loan application, [Defendant] knowingly made the following false representations:
>
> > (a) He did not have any credits towards the purchase of the house.
> >
> > (b) The value of the property was $522,000.
> >
> > (c) He did not have a business affiliation with the seller of the property.
> >
> > (d) He was not currently delinquent or in default on any Federal debt.
> >
> > (e) He had not entered into any agreement, written or oral, in connection with the real estate transaction, other than the sales contract submitted to the lender.
>
> . . . .
>
> 94. The earnings statements [Defendant] submitted to Navy Federal falsely indicated that he had received biweekly salary checks from his law firm and that state and federal income taxes had been withheld from the wages he earned in January and February 2021.
>
> 95. Pursuant to N.C. Gen. Stat. § 14-118.12, a "person is guilty of [the felony offense of] residential mortgage fraud when, for financial gain and with the intent to defraud, that person . . . [k]nowingly makes or attempts to make any material misstatement, misrepresentation, or omission within the mortgage lending process with the intention that a mortgage lender, mortgage broker, borrower, or any other person or entity that is involved in the mortgage lending process relies on it."
>
> 96. Pursuant to 18 U.S. Code § 1014, "[w]hoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . a Federal credit union . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, . . . or any person or entity that makes in whole or in part a federally related mortgage loan . . . upon any application . . . shall be

fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

97. [Defendant's] actions described in paragraphs 89 through 93 above, all when evaluated pursuant to the Panel's clear, cogent and convincing standard, were in violation of 18 U.S. Code § 1014 and constituted the criminal offense of residential mortgage fraud as defined in N.C. Gen. Stat. § 14-118.12.

### 1. *Finding of Fact 92*

Finding of Fact 92 is supported by the Navy Federal loan application and Defendant's own statements. Section 2b of the application, labeled "Other Assets and Credits You Have," states, "Include *all* other assets and credits below." (emphasis added). Defendant checked the box "Does not apply" despite contributing over $200,000 towards Sweet Fruits' purchase of the home. In section 4a of the application, labeled "Loan and Property Information," Defendant listed the property value as $522,000 despite the house being sold for $740,000 seven months earlier.

Section 5a of the application, "About this Property and Your Money for this Loan," asks, "Do you have a family relationship or business affiliation with the seller of the property?" Defendant checked the "no" box. However, Defendant admitted to having a business affiliation with Kristian Smith during his interview with Plaintiff:

> [PLAINTIFF]: But you knew you had bought the property from this entity that you were unfamiliar with. Like you didn't ask any q—like literally the grantor on the deed is Sweet Fruits, LLC. That wasn't strange to you?
>
> [DEFENDANT]: No, it wasn't because a lot of companies do that. A lot of companies buy and sell homes.
>
> [PLAINTIFF]: But this wasn't a company. This was your

> friend Kristian, who you met and simultaneously opened a
> bank account with.
>
> [DEFENDANT]: Well I call you guys "my friend," but she's
> really not my friend.  It was a *business situation*.  It was
> not a, um—it was a *business situation*.

(emphasis added).  Section 5b of the application, "About Your Finances," asks, "Are you currently delinquent or in default on a Federal debt?"  Defendant checked the "no" box.  However, the record is replete with evidence that Defendant was delinquent on multiple federal debts.

Section 6 of the application, labeled "Acknowledgements and Agreements," states the following:

> I agree to, acknowledge, and represent the following:
>
> . . . .
>
> For purchase transactions: The terms and conditions of any
> real estate sales contract signed by me in connection with
> this application are true, accurate, and complete to the best
> of my knowledge and belief.  I have not entered into any
> other agreement, written or oral, in connection with this
> real estate transaction.

Defendant argues that Plaintiff "did not introduce any recordings, writings, or other exhibits" that Defendant "and the seller had a written or oral agreement other than the purchase agreement."  However, Defendant admitted in his interview with Plaintiff that he had an oral agreement with Kristian Smith:

> [PLAINTIFF]: What's your verbal contract?
>
> [DEFENDANT]: You know the statute of frauds don't allow
> verbal contracts when it comes to real property, but . . .
>
> [PLAINTIFF]: Humor me.

[DEFENDANT]: What?

[PLAINTIFF]: What was the agreement?

[DEFENDANT]: The agreement is, was, that um, she would purchase the house for me. And she said later on she's gonna need me. And that I was responsible for paying all the fees associated therewith as well as any mortgage until I had put it in my name.

[PLAINTIFF]: Did you pay the homeowners' association too?

[DEFENDANT]: I paid those dues as well.

[PLAINTIFF]: So you literally paid all the maintenance due on the house.

[DEFENDANT]: I paid everything. Everything.

[PLAINTIFF]: All she had to do was just get the mortgage and going to closing.

[DEFENDANT]: That's it. And that's—my friends, that's not uncommon in domestic cases. A lot of times the husband or wife will have a straw purchaser purchase something for them. Purchase the house for them.

Accordingly, Finding of Fact 92 is supported by substantial evidence.

### 2. *Finding of Fact 94*

Finding of Fact 94 is supported by the earnings statements Defendant submitted in support of his loan application as well as testimony from Defendant's former CPA, a State Bar investigator, and Defendant himself. The earnings statement for 9 January 2021 to 22 January 2021 reflected that: (1) Defendant's gross pay was $8,400; (2) Defendant withheld $121.80 to pay FICA Medicare taxes, $520.80 to pay FICA Social Security taxes, $1,919.47 to pay federal income taxes, and $483 to pay state income taxes; and (3) Defendant's net pay was $5,354.93. The earnings

statement for 23 January 2021 to 5 February 2021 reflected the same earnings and deductions.

During the disciplinary hearing, Defendant's former CPA testified to the following:

> [PLAINTIFF:] Were you working with [Defendant] and the Key Law Office in January of 2021?
>
> [CPA:] We were.
>
> [PLAINTIFF:] To your knowledge, was the Key Law Office withholding federal and state income taxes from the wages of [Defendant] in January of 2021?
>
> [CPA:] Not to my knowledge on the bank account that we were reconciling, the check stubs we were receiving.
>
> [PLAINTIFF:] Did you look in your payroll records and the records that you received from [Defendant] for a check in the amount of $5,354.93 to [Defendant]?
>
> [CPA:] I did. I did not find it.
>
> [PLAINTIFF:] And . . . were you still working for [Defendant] and the Key Law Office assisting them with their payroll reports between January of 2021 and February 2021?
>
> [CPA:] Yes, ma'am.
>
> [PLAINTIFF:] To your knowledge, was the Key Law Office withholding state and federal income taxes from the wages of [Defendant] during that time?
>
> [CPA:] Not to my knowledge.
>
> [PLAINTIFF:] Did you look in the records that you have at your office about what had been paid from the operating account as salaries to [Defendant] and see a check in the amount of $5,354.93 to [Defendant]?
>
> [CPA:] I did look and did not see a check in that amount.

Furthermore, an investigator for the State Bar testified as follows:

[PLAINTIFF:] Did [Defendant] indicate to Navy Federal Credit Union through this earnings statement that he was withholding and paying federal and state income taxes from his own wages in January and February 2021?

[INVESTIGATOR:] Yes, that's correct.

[PLAINTIFF:] Did [Defendant] also indicate to the State Bar that he pays earned employee salaries including his own from his firm operating account?

[INVESTIGATOR:] Yes.

[PLAINTIFF:] Was there a check written for [Defendant's] firm operating account at PNC Bank in the amount of $5,354.93 on or about January 29, 2021?

[INVESTIGATOR:] No. Per my review for the operating account for that period, there is no such check in that amount.

[PLAINTIFF:] . . . was there a check written from [Defendant's] firm operating account in the amount of $5,354.93 on or around February 12, 2021?

[INVESTIGATOR:] No, not from my review of operating account records.

Defendant likewise testified that he "was not paid biweekly." Accordingly, Finding of Fact 94 is supported by substantial evidence.

### 3. *Finding of Facts 95, 96, and 97*

Findings of Fact 95, 96, and 97 are more appropriately categorized as conclusions of law, and we therefore review them de novo. *See Key*, 189 N.C. App. at 88, 658 S.E.2d at 499.

In addition to the findings of fact above, the DHC also made the following unchallenged findings of fact:

76. [Defendant] wanted to buy the property from [his

ex-girlfriend] when their relationship ended.

77. Although [she] intended to sell the property, she refused to sell it to [Defendant].

78. In July 2020, [Defendant] discussed his desire to buy the property with a man named Javon Howell, who was in a relationship with a woman named Kristian Smith. Howell and Smith agreed to purchase the property from [Defendant's ex-girlfriend] and sell it to [Defendant].

79. By mid-July 2020, [Defendant] had established a joint bank account with Smith.

80. On 14 July 2020, Smith incorporated an entity called Sweet Fruits Healing, LLC ("Sweet Fruits").

81. For approximately two months after he opened the joint account with Smith, [Defendant] moved large sums of money into and out of the account. Neither Smith nor Howell deposited funds into the account.

. . . .

83. On 24 September 2020, $20,000.00 of the funds [Defendant] had deposited into the joint account with Smith was transferred out to an account belonging to Smith and/or Howell.

84. On 28 September 2020, [Defendant's ex-girlfriend] sold the property to Sweet Fruits. The purchase price was $740,000.00, which Sweet Fruits partially funded with a $518,000.00 mortgage with a one-year repayment term.

85. Sweet Fruits paid the remainder of the purchase price with money deposited by [Defendant] into the joint account with Smith.

86. After Sweet Fruits bought the property, [Defendant] began living there again. On five occasions during the ensuing six months, [Defendant] provided Smith with approximately $4,800.00 purportedly to cover mortgage payments, escrows, and homeowner's association dues associated with the property.

As Findings of Fact 95, 96, and 97 are supported by the DHC's findings of fact

and the evidence supporting those findings, the DHC did not err by concluding that Defendant committed mortgage fraud.

## G. Misconduct During Grievance Process

Defendant argues that Plaintiff "failed to present sufficient evidence that Defendant made false statements and that such statements were material." (capitalization altered).

Under Rule 8.1, a lawyer in connection with a disciplinary matter shall not "knowingly make a false statement of material fact" or "knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority[.]" N.C. R. Prof. Cond. 8.1(a), (b).

Defendant challenges the following findings of fact:

> 102. In his 11 May 2021 response, [Defendant] falsely stated: "In early 2020 I not only filed all my tax returns[,] I paid $12,000 towards my outstanding taxes.
>
> . . . .
>
> 106. [Defendant] never completely produced all subpoenaed documents.
>
> 107. On 7 July 2021, [Defendant] was interviewed by the State Bar regarding grievance file nos. 21G0082 and 20G0861. During the interview, [Defendant] made false statements, including:
>
>> (a) That he had signed and filed his past-due income tax returns at the same time he filed his past-due federal tax income returns;
>>
>> (b) That he did not see or sign the Navy Federal loan application until the date of closing; and
>>
>> (c) That he first learned during the week prior to the

interview that certain federal tax lien documents had been filed against him.

In his response to Plaintiff's letter of notice, Defendant stated, "In early 2020 I not only filed all my tax returns I paid $12,000 towards my outstanding taxes." When Plaintiff asked during the interview for documentation of this payment, Defendant stated, "I could've sworn I paid $12,000, so that may have been an error." Despite Defendant's representation that he paid $12,000 towards his taxes, Defendant never provided any documentation that such payment was made. Accordingly, Finding of Fact 102 is supported by substantial evidence.

Likewise, Finding of Fact 106 is supported by substantial evidence. Plaintiff sent emails to Defendant on 29 April 2021 and 7 May 2021 detailing which documents were missing from Defendant's previous partial disclosures. Plaintiff also reviewed a spreadsheet with Defendant during the interview to explain which documents were still missing. This evidence directly negates Defendant's contention that Plaintiff "fail[ed] to allege the specific documents not received."

Finding of Fact 107 is supported by Defendant's statements during his interview with Plaintiff. Defendant stated that he thought he filed his state income tax returns at the same time he filed his federal income tax returns. Defendant further stated, "I signed both state and federal income tax returns and I asked my secretary to put them in the mail to the respective agencies." Defendant stated that he "definitely signed them" and "hope they were put in the mail." Regarding the Navy

Federal loan application, Defendant stated that he "never saw the application until . . . closing[,]" and that he "signed it at closing." With respect to the federal tax lien documents, Defendant stated, "First, I already told you in that letter that I wasn't aware of that which I was not aware of those liens being filed. But I actually recently looked at them, like a week ago . . . ." Defendant further stated, "I didn't even know that this was filed until last week. When you guys requested the information and I did my objection, I emailed them and asked them to send me the liens and, and anything involving the liens, and that was my first time seeing this." Accordingly, Finding of Fact 107 is supported by substantial evidence.

In addition to these findings of fact, the DHC also made the following unchallenged findings of fact:

> 103. [Defendant] was also served with a subpoena issued by the Grievance Committee in connection with file no. 21G0082 and file no. 20G0861 (which involved the allegations of trust account mismanagement . . . ).
>
> 104. [Defendant] was required to produce documents pursuant to the subpoena on 9 April 2021. [Defendant] did not produce any documents pursuant to the subpoena on 9 April 2021.
>
> 105. [Defendant] produced documents on April 21, April 27, May 3, and May 17. After each partial-production, the State Bar sent him a detailed follow up email stating what was still missing.

The DHC's findings of fact support its conclusions of law that:

> (o) By failing to timely respond to the Letter of Notice and failing to timely and fully comply with the subpoena in grievance file no. 21G0082, Defendant knowingly failed to

respond to lawful demands for information from a disciplinary authority in violation of Rule 8.1(b); and

(p) By providing false information to the State Bar during the grievance process, Defendant knowingly made false statements of material fact in connection with a disciplinary matter in violation of Rule 8.1(a).

Accordingly, the DHC did not err by concluding that Defendant violated Rule 8.1(a) and (b).

**H. Discipline**

Defendant argues that "the DHC abused its discretion in imposing finding[s] of fact[], conclusions of law and imposing suspension in the order of discipline against [him]." (capitalization altered). Defendant specifically argues that his case should not have proceeded to the disposition phase because "the DHC should not have found against [him] during the adjudication phase." As discussed above, the DHC did not err by finding and concluding that Defendant engaged in misconduct. The DHC thus did not err by proceeding to the disposition phase to determine the appropriate discipline.

## V. Plaintiff's Cross-Appeal

Plaintiff argues that (1) the DHC erred by prohibiting Plaintiff from objecting during Defendant's testimony; (2) the DHC failed to make certain conclusions of law; (3) several of the DHC's findings of fact and conclusions of law regarding discipline are unsupported; and (4) the DHC abused its discretion by suspending Defendant's law license. We address each argument in turn.

**A. Objections During Defendant's Testimony**

Plaintiff first argues that "the DHC committed fundamental error when it suspended the application of the Rules of Evidence by prohibiting the State Bar from objecting during Defendant's testimony." (capitalization altered). Plaintiff concedes that it is "not challenging findings by the DHC that were based on inadmissible testimony to which the State Bar was not permitted to object" but nonetheless asks this Court to address this issue "so future litigants . . . are not similarly deprived of the substantial right of meaningful appellate review." We decline the request to do so and dismiss this portion of Plaintiff's appeal.

**B. Rule 8.4(b)**

Plaintiff argues that the DHC erred by failing to conclude that Defendant violated Rule 8.4(b) because the DHC "found that Defendant engaged in the precise conduct criminalized under 26 U.S.C. § 7206(1)."

Under Rule 8.4(b), it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]" N.C. R. Prof. Cond. 8.4(b). Pursuant to 26 U.S.C. § 7206, which governs the crime of fraud and false statements, any person who "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony[.]" 26 U.S.C. § 7206(1).

Here, the DHC made the following findings of fact:

> 45. On 9 May 2019, approximately three months after
> Zephir notified [Defendant] that her W-2 was inaccurate
> and one day after he participated in the hearing at which
> judgment was entered against him on Zephir's claim,
> [Defendant] filed with the IRS a Transmittal of Wage and
> Tax Statement (IRS form W-3) along with W-2 forms for
> the employees of his law firm during 2018.
>
> 46. The W-2 form for Zephir that [Defendant] filed on
> 9 May 2019 underreported Zephir's 2018 wages.
>
> 47. By signing the W-3, [Defendant] swore under penalty
> of perjury to the accuracy of the W-2 that he knew
> underreported Zephir's wages.

Contrary to Plaintiff's assertion, the DHC did not find that Defendant engaged in all elements of 26 U.S.C. § 7206(1) because the DHC did not find that Defendant acted willfully. Accordingly, the DHC did not err by failing to conclude that Defendant violated Rule 8.4(b).

## C. Findings of Fact Regarding Discipline

Plaintiff argues that "two of the DHC's findings of fact regarding discipline related to Defendant's character and reputation are not supported by evidence." (capitalization altered).

These challenged findings state:

> 11. Senior Resident Superior Court Judge Winston
> Gilchrist testified that Defendant was a valued member of
> the Harnett County Bar, and provided legal services to
> many indigent defendants in criminal matters. Judge
> [Gilchrist] also testified that Defendant served a unique
> and valuable role in his representation of a particular
> subset of that County's population. Judge Gilchrist also

N.C. STATE BAR V. KEY

testified that although he had many interactions with Defendant during Defendant's years of practice (both as opposing counsel and as a judge), he never observed Defendant engage in inappropriate courtroom conduct. The Panel gave substantial weight to Judge Gilchrist's testimony in reaching discipline for Defendant.

. . . .

13. Defendant has assisted those less fortunate in his community, including but not limited to, providing temporary shelter at his office for members of the community's homeless population when weather was severe, and the best version of Defendant is a positive lawyer role model for young men.

Judge Gilchrist testified that he was familiar with Defendant's reputation and that Defendant "enjoy[s] a good reputation among the judges in Harnett County" and is "a much sought-after attorney by many folks." Judge Gilchrist further testified that "[w]e certainly depend on [Defendant] a great deal in terms of indigent representation, which is a significant problem that we face in the court system today, having enough attorneys who are willing to do that[,]" and that Defendant has "always been willing to take those types of cases and handle them diligently." Judge Gilchrist also testified that he "never found [Defendant] to be inappropriate" and has "never had any difficulty with [Defendant] personally in court in terms of being able to get along with [him]." Accordingly, Finding of Fact 11 is supported by substantial evidence.

Finding of Fact 13 is supported in part by testimony from Defendant's employee that Defendant is "pretty active in the community" and "a very positive

force in the community with young men." Defendant's employee further testified that Defendant donated boxes of food to help "families that are in need" and donated money to a family whose house burned down. However, the record is devoid of evidence that Defendant "provid[ed] temporary shelter at his office for members of the community's homeless population when weather was severe," and this portion of Finding of Fact 13 is therefore unsupported. Nonetheless, the remainder of Finding of Fact 13 is supported by substantial evidence.

**D. Conclusions of Law Regarding Discipline**

Plaintiff argues that the DHC erred by "failing to make conclusions of law that were established by its findings of fact, the record, and the evidence"; "making findings of fact regarding discipline that were unsupported by adequate evidence"; "making a conclusion of law based on those unsupported findings"; and "failing to make a necessary finding that was supported by uncontroverted evidence." (capitalization altered).

"If the charges of misconduct are established, the [DHC] will consider any evidence relevant to the discipline to be imposed." 27 N.C. Admin. Code 1B.0116(f). In imposing the appropriate discipline, the DHC must consider several factors, including:

> (A) prior disciplinary offenses in this state or any other jurisdiction, or the absence thereof;
> . . . .
> (C) dishonest or selfish motive, or the absence thereof;

. . . .

(F) a pattern of misconduct;

(G) multiple offenses;

(H) effect of any personal or emotional problems on the conduct in question;

. . . .

(N) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(O) refusal to acknowledge wrongful nature of conduct;

. . . .

(Q) character or reputation;

(R) vulnerability of victim; [and]

(S) degree of experience in the practice of law[.]

27 N.C. Admin. Code 1B.0116(f)(3).

In imposing suspension or disbarment, the DHC must consider the following factors, among others:

(C) circumstances reflecting the defendant's lack of honesty, trustworthiness, or integrity;

. . . .

(E) negative impact of defendant's actions on client's or public's perception of the profession;

(F) negative impact of the defendant's actions on the administration of justice;

. . . .

(H) effect of defendant's conduct on third parties; [and]

(I) acts of dishonesty, misrepresentation, deceit, or fabrication[.]

27 N.C. Admin. Code 1B.0116(f)(1). Moreover, disbarment "shall be considered where

the defendant is found to engage in:"

> (A) acts of dishonesty, misrepresentation, deceit, or fabrication;
>
> (B) impulsive acts of dishonesty, misrepresentation, deceit, or fabrication without timely remedial efforts; [or]
>
> . . . .
>
> (D) commission of a felony.

27 N.C. Admin. Code 1B.0116(f)(2).

We review the DHC's disciplinary action for abuse of discretion. *N.C. State Bar v. Culbertson*, 177 N.C. App. 89, 97, 627 S.E.2d 644, 650 (2006).

### 1. Commission of a Felony

Plaintiff argues that "the DHC erred by failing to conclude as a matter of law that Defendant's commission of a felony was among the factors considered in deciding the appropriate discipline[.]" We agree.

Under 27 N.C. Admin. Code 1B.0116(f)(2)(D), "[d]isbarment shall be considered where the defendant is found to engage in: . . . [the] commission of a felony." 27 N.C. Admin. Code 1B.0116(f)(2)(D).

Here, the DHC made the following findings of fact:

> 29. "Any person required under [the IRS Code] to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over [income taxes withheld from employee wages and FICA taxes] shall, in addition to other penalties provided by law, be guilty of a felony." 26 U.S.C. § 7202.
>
> 30. Under this Panel's clear, cogent and convincing standard of review, [Defendant] violated 26 U.S.C. § 7202

by:

> (a) willfully failing to withhold federal income taxes from the wages of his law firm employees, including his own; and
>
> (b) willfully failing to pay over to Treasury all FICA taxes withheld from the wages of firm employees in 2019.

. . . .

95. Pursuant to N.C. Gen. Stat. § 14-118.12, a "person is guilty of [the felony offense of] residential mortgage fraud when, for financial gain and with the intent to defraud, that person . . . [k]nowingly makes or attempts to make any material misstatement, misrepresentation, or omission within the mortgage lending process with the intention that a mortgage lender, mortgage broker, borrower, or any other person or entity that is involved in the mortgage lending process relies on it."

96. Pursuant to 18 U.S. Code § 1014, "[w]hoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . a Federal credit union . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, . . . or any person or entity that makes in whole or in part a federally related mortgage loan . . . upon any application . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

97. [Defendant's] actions . . . , all when evaluated pursuant to the Panel's clear, cogent and convincing standard, were in violation of 18 U.S. Code § 1014 and constituted the criminal offense of residential mortgage fraud as defined in N.C. Gen. Stat. § 14-118.12.

Despite finding that Defendant engaged in the commission of multiple felonies, the DHC did not conclude that this factor, which requires disbarment to be considered, was present in this case.

Accordingly, the DHC erred by failing to consider Defendant's commission of multiple felonies in imposing the appropriate discipline.

### 2. *Bad Faith Obstruction of the Disciplinary Process*

Plaintiff argues that "the DHC erred by failing to conclude as a matter of law that Defendant's bad faith obstruction of the disciplinary process was among the factors required to be considered in deciding the appropriate discipline[.]" We agree.

In all disciplinary cases, the DHC must consider a defendant's "bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency" in imposing the appropriate discipline. 27 N.C. Admin. Code 1B.0116(f)(3)(M). Pursuant to Rule 8.1 of the Rules of Professional Conduct, a lawyer in connection with a disciplinary matter shall not "knowingly make a false statement of material fact" or "knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority[.]" N.C. R. Prof. Cond. 8.1(a), (b).

Here, the DHC made the following findings of fact:

> 98. The State Bar opened grievance file no. 21G0082 to investigate the tax-related matters . . . .
>
> 99. [Defendant] was served with a Letter of Notice in grievance file no. 21G0082 that required him to submit a response to the allegations in the grievance within 15 days. [Defendant] did not respond within 15 days.
>
> 100. [Defendant's] response to the Letter of Notice in file no. 21G0082 was due on 31 March 2021. He did not request an extension of time and did not respond until 11 May 2021.

. . . .

103. [Defendant] was also served with a subpoena issued by the Grievance Committee in connection with file no. 21G0082 and file no. 20G0861 (which involved the allegations of trust account mismanagement . . .).

104. [Defendant] was required to produce documents pursuant to the subpoena on 9 April 2021. [Defendant] did not produce any documents pursuant to the subpoena on 9 April 2021.

. . . .

106. [Defendant] never completely produced all subpoenaed documents.

107. On 7 July 2021, [Defendant] was interviewed by the State Bar regarding grievance file nos. 21G0082 and 20G0861. During the interview, [Defendant] made false statements . . . .

Based on these findings of fact, the DHC made the following conclusions of law:

(o) By failing to timely respond to the Letter of Notice and failing to timely and fully comply with the subpoena in grievance file no. 21G0082, Defendant knowingly failed to respond to lawful demands for information from a disciplinary authority in violation of Rule 8.1(b); and

(p) By providing false information to the State Bar during the grievance process, Defendant knowingly made false statements of material fact in connection with a disciplinary matter in violation of Rule 8.1(a).

By "knowingly fail[ing] to respond to lawful demands for information" from Plaintiff in violation of Rule 8.1(b) and "knowingly ma[king] false statements of material fact in connection with [Plaintiff's] disciplinary matter" in violation of Rule 8.1(a), Defendant "intentionally fail[ed] to comply with rules or orders of [a] disciplinary agency[.]" *See* 27 N.C. Admin. Code 1B.0116(f)(3)(M). Accordingly, the

DHC erred by failing to consider Defendant's "bad faith obstruction of the disciplinary proceedings" in imposing the appropriate discipline.

### 3. *Character or Reputation*

Plaintiff argues that the DHC's conclusion of law that "Defendant's character and/or reputation was a relevant factor in determining the appropriate discipline . . . is contradicted by the DHC's findings about his dishonesty and criminality and is supported only by two findings that lack evidentiary support."

In all disciplinary cases, "any or all of the following factors shall be considered in imposing the appropriate discipline: . . . character or reputation[.]" 27 N.C. Admin. Code 1B.0116(f)(3)(Q).

Here, the DHC made the following findings of fact:

> 11. Senior Resident Superior Court Judge Winston Gilchrist testified that Defendant was a valued member of the Harnett County Bar, and provided legal services to many indigent defendants in criminal matters. Judge [Gilchrist] also testified that Defendant served a unique and valuable role in his representation of a particular subset of that County's population. Judge Gilchrist also testified that although he had many interactions with Defendant during Defendant's years of practice (both as opposing counsel and as a judge), he never observed Defendant engage in inappropriate courtroom conduct. The Panel gave substantial weight to Judge Gilchrist's testimony in reaching discipline for Defendant.
>
> 12. Defendant is an effective criminal defense lawyer and can be an asset to clients in that role.
>
> 13. Defendant has assisted those less fortunate in his community, including but not limited to, *providing temporary shelter at his office for members of the*

*community's homeless population when weather was severe,* and the best version of Defendant is a positive lawyer role model for young men.

As discussed above, the italicized portion of Finding of Fact 13 is unsupported by the evidence. Nonetheless, the remainder of this finding, along with the other findings, support the DHC's conclusion that Defendant's character or reputation was among the factors to be considered in imposing the appropriate discipline.

Accordingly, the DHC did not err by considering Defendant's character or reputation in imposing the appropriate discipline.

### 4. *Negative Impact of Defendant's Actions on Client's or Public's Perception of the Profession*

Plaintiff argues that "the Order of Discipline does not contain any finding to support paragraph 2(b) of the DHC's conclusions of law regarding discipline, providing that the negative impact of Defendant's actions on the perception of the profession was among the factors relevant to determining the appropriate discipline." (capitalization altered). Plaintiff argues that "[u]ncontroverted testimony supported this conclusion, but the DHC erred by failing to support its conclusion with any finding of fact" and asks this Court to "remand this matter to the DHC for entry of an Order of Discipline containing the appropriate finding."

Under 27 N.C. Admin. Code 1B.0116(f)(1)(E), "[t]he following factors shall be considered in imposing suspension or disbarment: . . . negative impact of defendant's actions on client's or public's perception of the profession[.]" 27 N.C. Admin. Code

1B.0116(f)(1)(E).

Here, the DHC made the following finding of fact:

> 7. Both the prosecutor and the presiding judge in the [felonious restraint] case testified that they had never seen courtroom conduct by a lawyer that was as aggressive and disrespectful as Defendant's conduct during the [felonious restraint] trial. When an officer of the court publicly displays disrespect for the judiciary, it tends to damage public perception of the legal system and undermine public confidence in the legitimacy of the judicial process. Defendant's courtroom conduct posed a risk of significant harm to public perception of the legal system, the reputation of the profession, and the administration of justice.

Contrary to Plaintiff's assertion, this finding supports the DHC's conclusion that the "negative impact of Defendant's actions on clients or the public's perception of the profession" was among the factors "to be considered in imposing suspension or disbarment[.]" Plaintiff's argument therefore lacks merit.

## E. Discipline

Plaintiff argues that "the DHC abused its discretion by suspending Defendant's license to practice law rather than disbarring him, when suspension was inconsistent with prior cases and not reasonably related to the protection of the public, the profession, and the administration of justice." (capitalization altered). Because we have determined that the DHC erred by failing to consider Defendant's commission of multiple felonies and bad faith obstruction of the disciplinary proceedings in imposing the appropriate discipline, we do not address Plaintiff's

argument.

## VI. Conclusion

The DHC did not err by finding and concluding that Defendant engaged in misconduct, and we dismiss the arguments that are not properly before us. However, because the DHC failed to consider Defendant's commission of multiple felonies and bad faith obstruction of the disciplinary proceedings in imposing the appropriate discipline, we vacate the portion of the order of discipline suspending Defendant's law license and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART; DISMISSED IN PART; VACATED AND REMANDED IN PART.

Judges ZACHARY and FLOOD concur.